**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| **PEGGY J. JONES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 1:07CV101 LMB** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Peggy J. Jones for Disability Insurance Benefits under Title II of the Social Security Act. This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties. See 28 U.S.C. § 636(c). Plaintiff has filed a Brief in Support of Plaintiff's Complaint. (Document Number 9). Defendant has filed a Brief in Support of the Answer. (Doc. No. 13).

## Procedural History

On April 28, 2004, plaintiff filed her application for benefits, claiming that she became unable to work due to her disabling condition on August 1, 2001. (Tr. 44-47). This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated June 22, 2006. (Tr. 31-32, 13-22). Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on May 11, 2007. (Tr. 7, 4-6). Thus,

the decision of the ALJ stands as the final decision of the Commissioner.  See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A.    ALJ Hearing

Plaintiff's administrative hearing was held on December 7, 2005.  (Tr. 350).  Plaintiff was present and was represented by counsel.  (Id.).  Vocational expert John McGowan was also present.  (Id.).  The ALJ began the hearing by admitting all of the exhibits into the record.  (Tr. 351).

The ALJ then examined plaintiff, who testified that she was 61 years of age and was right-hand dominant.  (Id.).  Plaintiff stated that she lived with her husband in Winona, Missouri.  (Id.).  Plaintiff testified that Winona is about 50 miles from West Plains.  (Tr. 352).  Plaintiff stated that her husband drove her to the hearing.  (Id.).  Plaintiff testified that she drives around town.  (Id.).  Plaintiff stated that she did not stop on the way to the hearing.  (Id.).

Plaintiff testified that she graduated from high school and received some business training after high school.  (Id.).  Plaintiff stated that she never served in the military.  (Id.).  Plaintiff testified that her last position was at Paramount Headwear in Winona operating a sewing machine.  (Id.).  Plaintiff stated that she worked at this position for eight years.  (Id.).

Plaintiff testified that prior to working at Paramount Headwear she worked at Timcon Incorporated in Fort Collins, Colorado, as a part owner and office manager of a temperature control business.  (Id.).  Plaintiff stated that she and her husband owned the business, which was an air conditioner and heating business that worked with commercial buildings.  (Tr. 353).  Plaintiff testified that she did whatever needed to be done at this position, including office work

and labor. (Id.). Plaintiff stated that she took business courses in high school, which helped her

with the office aspect of the business. (Id.). Plaintiff testified that her husband taught her how to

perform the other aspects of the job. (Id.). Plaintiff stated that she kept invoices until the

business grew large enough to hire someone to help with these duties. (Tr. 354). Plaintiff

testified that the business did not have computers. (Id.). Plaintiff stated that the business closed

in 1991, at which time she moved to Winona. (Id.).

Plaintiff testified that she did not work in 1991 after moving to Winona. (Id.). Plaintiff

stated that she worked for Wal-Mart as a cashier in 1992. (Id.).

Plaintiff testified that she worked for Paramount in early 1993. (Id.). Plaintiff stated that

Paramount manufactured custom ball caps. (Id.). Plaintiff testified that currently, the caps are

made overseas and are embroidered in Winona, although they were made in Winona when she

worked there. (Id.). Plaintiff stated that the first year she worked at Winona she operated a large

embroidery machine while standing. (Tr. 355). Plaintiff testified that she was later transferred to

a position where she could sit while operating a sewing machine. (Id.). Plaintiff stated that she

also performed other duties, including picking up boxes, at this position. (Id.). Plaintiff testified

that the heaviest item she lifted at this position was a 25-pound box of caps. (Tr. 355-56).

Plaintiff stated that she left her position at Paramount because her husband accepted a

position in Colorado. (Tr. 356). Plaintiff testified that she moved to Colorado for two years and

then moved back to Winona. (Id.). Plaintiff stated that she was diagnosed with cancer when she

lived in Colorado. (Id.).

Plaintiff testified that she has had cancer two times. (Id.). Plaintiff stated that the last time

she had cancer, her kidney was surgically removed. (Id.). Plaintiff testified that she underwent

surgery on September 25, 2001. (Id.). Plaintiff stated that she did not undergo chemotherapy because the cancer was contained in her kidney. (Id.). Plaintiff testified that the first time she had cancer, the cancer was contained in either her ovaries or her uterus. (Id.).

Plaintiff stated that she was unable to work at the time of the hearing due to arthritis. (Id.). Plaintiff testified that she was involved in a car accident when she was eighteen years of age, at which time she suffered broken bones and a concussion. (Tr. 357). Plaintiff stated that she was diagnosed with arthritis when she was 25 or 26 years of age, and that it has worsened over the years. (Id.).

Plaintiff testified that she was living in Colorado when she underwent surgery for the cancer. (Id.). Plaintiff stated that she returned to Winona in 2002. (Id.). Plaintiff testified that she has seen several doctors since returning to Winona. (Id.).

Plaintiff stated that she is insured by Tri-Care through her husband's military retirement benefits. (Id.). Plaintiff testified that her insurance requires her to receive medical care from either the St. John's network or Dr. Eugene Honeywell in Licking. (Id.). Plaintiff stated that she saw different doctors in the St. John's network. (Tr. 358). Plaintiff testified that it costs considerably more to see doctors in the St. John's network than it does to see Dr. Honeywell. (Id.). Plaintiff stated that she started seeing Dr. Honeywell two years prior to the hearing. (Id.).

Plaintiff testified that she last saw Dr. Honeywell because she was losing blood and she is anemic. (Id.). Plaintiff stated that she was hospitalized and was given a blood transfusion. (Id.). Plaintiff testified that Dr. Honeywell planned to run tests the week following the hearing. (Id.). Plaintiff stated that she felt better after being hospitalized, although she still did not feel good. (Tr. 359).

Plaintiff testified that when she returned to Winona in 2002, she served as president of the Lions Club for three years. (Id.). Plaintiff stated that she had to resign from this position in May of 2005 due to her health. (Tr. 360). Plaintiff testified that she felt too fatigued, ill, and depressed to perform the duties of this position. (Id.).

Plaintiff stated that she has been taking medication for depression since January of 2005. (Id.). Plaintiff testified that she had been experiencing depression for a while, but it increased to the extent that she was considering suicide, at which time she sought treatment from Dr. Honeywell. (Id.). Plaintiff stated that Dr. Honeywell prescribed Zoloft.[1] (Id.). Plaintiff testified that Dr. Honeywell has not increased her dosage of Zoloft. (Id.).

Plaintiff stated that she also has been taking hydroxyzine[2] for anxiety for fifteen to twenty years. (Id.). Plaintiff testified that she can take the hydroxyzine up to four times a day as needed. (Id.). Plaintiff stated that the anxiety medication helps. (Id.).

Plaintiff testified that she takes Procanbid[3] for her heart. (Tr. 362). Plaintiff stated that her heart stops beating if she does not take medication to regulate it. (Id.). Plaintiff testified that her father died when he was 47 years of age due to this same heart condition. (Id.). Plaintiff stated that she has been taking medication for her heart condition since the 1980s. (Id.).

---

[1]Zoloft is indicated for the treatment of major depressive disorder, obsessive-compulsive disorder, panic disorder and posttraumatic stress disorder. See Physician's Desk Reference (PDR), 2676-77 (57th Ed. 2003).

[2]Hydroxyzine hydrochloride is indicated for symptomatic relief of anxiety and tension. See PDR at 2577.

[3]Procanbid is indicated for the treatment of ventricular arrhythmias. See PDR at 2180.

Plaintiff testified that she takes Lisinopril[4] and Hydrochlorothiazide[5] for her blood pressure.  (Id.).  Plaintiff stated that these medications regulated her blood pressure until her recent hospitalization for the blood loss.  (Id.).  Plaintiff testified that she was hospitalized because she passed out and fell to the floor.  (Id.).  Plaintiff stated that she has been taking the same medication for her blood pressure since she was released from the hospital.  (Id.).  Plaintiff testified that her blood pressure has been better since she received the blood transfusion.  (Id.).

Plaintiff stated that she has been taking hormone replacement medication since prior to undergoing surgery.  (Id.).

Plaintiff testified that she takes Aciphex[6] for acid reflux.  (Tr. 364).  Plaintiff stated that the Aciphex helps her acid reflux most of the time, although she still has to be careful with her diet.  (Id.).

Plaintiff testified that she started taking iron recently.  (Id.).

Plaintiff stated that she was given an inhaler to use as needed due to her blood loss.  (Id.).  Plaintiff testified that she has only used the inhaler on one occasion.  (Id.).

Plaintiff stated that she takes Mucinex, which is an over-the-counter medication, for congestion.  (Tr. 365).

Plaintiff testified that she takes Motrin[7] as needed for pain.  (Id.).  Plaintiff stated that she

_____

[4]Lisinopril is indicated for the treatment of hypertension.  See PDR at 2070.

[5]Hydrochlorothiazide is indicated for the treatment of hypertension.  See PDR at 2254-55.

[6]Aciphex is indicated for the treatment of GERD.  See PDR at 1242-43.

[7]The active ingredient in Motrin is ibuprofen, which is indicated for the treatment of mild to moderate pain.  See PDR at 1900-01.

experiences pain in her chest, joints, and hands.  (Id.).

Plaintiff testified that her fingers occasionally pull back due to arthritis.  (Id.).  Plaintiff stated that she had not seen a doctor for the problem with her hands because she did not feel the problem was severe.  (Tr. 366).

Plaintiff testified that on a typical day over the last couple of years, she wakes up between 8:30 and 9:00 a.m.  (Id.).  Plaintiff stated that she usually goes to bed at 8:30 or 9:00 p.m.  (Id.).  Plaintiff testified that she occasionally naps during the day.  (Id.).  Plaintiff stated that when she gets up in the morning, she drinks a cup of coffee and then performs household chores.  (Id.).  Plaintiff testified that she does laundry, makes the bed, and cooks.  (Id.).  Plaintiff stated that she stays at home on most days.  (Id.).

Plaintiff testified that she leaves the house to have her hair done every Tuesday.  (Id.).  Plaintiff stated that she plays Bingo on Tuesday nights at the Lion's Club and tries to help in the kitchen during Bingo.  (Tr. 367).  Plaintiff stated that she plays Bingo and she works in the kitchen.  (Id.).  Plaintiff testified that she serves food and occasionally cooks food.  (Id.).

Plaintiff stated that she shops for groceries as needed.  (Tr. 368).  Plaintiff testified that she tries to buy large quantities of groceries and freezes them.  (Id.).  Plaintiff stated that her husband carries the groceries in the house and helps her put them away.  (Id.).  Plaintiff testified that her husband also vacuums.  (Id.).  Plaintiff stated that she is no longer able to vacuum because it puts stress on her back.  (Id.).

Plaintiff testified that she does not belong to any groups or organizations other than the Lion's Club.  (Id.).  Plaintiff stated that she does not belong to a church.  (Id.).

Plaintiff testified that she visits with her mother-in-law regularly.  (Id.).  Plaintiff stated

that her mother-in-law, who is 87 years of age, frequently comes to her house to check on her. (Id.). Plaintiff testified that her mother-in-law cooks for her if she is not feeling well. (Id.).

Plaintiff stated that she traveled with her husband to Colorado to visit her daughter a year prior to the hearing. (Id.). Plaintiff testified that she stopped in Junction City, Kansas on her way to Colorado. (Id.).

Plaintiff stated that she does not have any difficulty taking care of her personal needs. (Tr. 370). Plaintiff testified that when she injured her back she had difficulty fastening support garments, but she no longer has much difficulty with her back. (Id.). Plaintiff stated that she has a lump on her back where her back was broken. (Tr. 371).

Plaintiff testified that her only hobbies other than Bingo are reading, watching television, and talking to her daughter on the telephone. (Id.). Plaintiff stated that she used to enjoy sewing but she no longer has the energy to sew. (Id.). Plaintiff testified that she rarely goes out to dinner. (Id.). Plaintiff stated that she goes to a restaurant in Winona about once a month. (Id.). Plaintiff testified that she also eats at a restaurant when she travels to West Plains. (Id.).

Plaintiff stated that the heaviest item she lifts is her purse, which is not heavy. (Tr. 372). Plaintiff testified that she is able to lift a gallon of milk but she could probably not lift a gallon of milk in each hand. (Id.). Plaintiff stated that her doctor told her not to lift anything if it hurts her back. (Tr. 373).

Plaintiff testified that she can stand comfortably for thirty minutes to an hour. (Id.). Plaintiff stated that she can sit for an hour to an hour-and-a-half. (Id.).

Plaintiff testified that prior to her anemia problems, she experienced some difficulty walking up stairs. (Id.). Plaintiff stated that she would have to walk up a few stairs at a time and

then stop to rest. (Id.). Plaintiff testified that her difficulty with stairs could possibly be due to her age. (Id.).

Plaintiff stated that the only time she has taken narcotic strength medication for pain was during hospitalizations or following surgery. (Tr. 374). Plaintiff testified that she has never taken narcotic medications on a regular basis. (Id.).

Plaintiff stated that she attended physical therapy when she worked for Target because she injured her back on the job. (Id.). Plaintiff testified that she worked for Target for five years beginning in 1979, prior to owning her own business. (Id.).

Plaintiff stated that her employment is sporadic due to her husband's military service. (Tr. 375). Plaintiff testified that she had to move when her husband was transferred. (Id.). Plaintiff stated that her husband was stationed in Hawaii a few times. (Id.).

Plaintiff's attorney then examined plaintiff, who testified that she did not work after moving back to Missouri from Colorado in 2002. (Tr. 376). Plaintiff stated that when she first moved back to Missouri, she was recovering from cancer surgery. (Id.). Plaintiff testified that after she recovered from the cancer surgery, her arthritis worsened and she experienced a bout of depression. (Id.).

Plaintiff stated that her arthritis caused her to experience difficulty walking. (Id.). Plaintiff testified that she is unable to walk far and her legs occasionally lock up. (Id.). Plaintiff stated that she has also been told by a doctor that her left knee is deteriorating. (Id.). Plaintiff testified that she has not followed up with regard to her knee because she is able to walk "okay." (Id.). Plaintiff stated that she is able to walk twenty to thirty feet before she has to rest. (Tr. 377). Plaintiff testified that she is sometimes able to walk while shopping in a store like Wal-Mart and

she occasionally uses an electric cart to shop.  (Id.).

Plaintiff stated that her fingers occasionally draw up due to arthritis.  (Id.).  Plaintiff testified that this usually occurs three to four times a week, although it occasionally occurs daily for a month.  (Tr. 378).  Plaintiff stated that when her fingers draw up, she takes Motrin and pulls her hand back into position.  (Id.).  Plaintiff testified that it usually takes ten to fifteen minutes to release her hand.  (Id.).  Plaintiff stated that she usually places her hand in hot water after she pulls her hand into position.  (Id.).  Plaintiff testified that she experiences pain when this occurs.  (Id.).

Plaintiff stated that she did not have problems with her hands when she worked at the cap factory or any of her other positions.  (Tr. 379).  Plaintiff testified that her hand problem began in 2001 and has persisted since that time.  (Id.).  Plaintiff stated that she is unable to use her hands to grasp when an episode occurs.  (Id.).  Plaintiff testified that there is no way to predict when a hand episode will occur.  (Id.).  Plaintiff stated that the Motrin helps alleviate the pain in her hands during an episode.  (Id.).

Plaintiff testified that she does not perform much housework.  (Tr. 380).  Plaintiff stated that since she received the blood transfusion, she has a little more energy and is able to do more.  (Id.).  Plaintiff testified that she stops frequently to take breaks when performing housework.  (Id.).  Plaintiff stated that she usually works for about thirty minutes and then sits down for forty-five minutes due to pain.  (Id.).  Plaintiff testified that she experiences pain in her hands, legs, and back.  (Id.).

Plaintiff stated that she is able to work on the computer for about twenty minutes before she has to stop because her hands draw.  (Id.).  Plaintiff testified that when she stops working on the computer, she sits in a chair and watches television or lies down for thirty to forty-five

minutes.  (Tr. 381).  Plaintiff stated that she sits down more than half of an average day.  (Id.).

Plaintiff testified that her mother-in-law comes to her house two to three times a week to help her cook.  (Id.).  Plaintiff stated that her mother-in-law does not help her with the housework because she is 87 years of age.  (Id.).  Plaintiff testified that her mother-in-law comes over because she is worried about her.  (Id.).  Plaintiff stated that she does not usually ask her mother-in-law to come over to help.  (Tr. 382).

Plaintiff testified that she vacuums very infrequently.  (Id.).  Plaintiff stated that she is no longer able to get down on her hands and knees to clean her floors.  (Id.).  Plaintiff testified that she is unable to get up and down on her own.  (Id.).

Plaintiff stated that she is able to stand or walk for thirty minutes to an hour before she experiences pain and exhaustion.  (Id.).  Plaintiff testified that she then sits or lies down until she can build up enough energy to get up again.  (Id.).

Plaintiff stated that her impairments intensified in 2001.  (Tr. 383).  Plaintiff testified that she was diagnosed with arthritis when she was in her mid 20s and it has worsened over the years.  (Id.).  Plaintiff stated that she did not seek treatment for arthritis when she was in her 20s.  (Id.).  Plaintiff testified that she experiences swelling in her joints daily, particularly in her hands.  (Id.).  Plaintiff stated that her hands were swollen during the hearing.  (Id.).

Plaintiff testified that she has been seeing Dr. Honeywell for about a year-and-a-half.  (Id.).  Plaintiff stated that Dr. Honeywell is aware of her various problems.  (Tr. 384).

The ALJ then re-examined plaintiff, who testified that her mother-in-law did not come to her house three days a week prior to plaintiff's hospitalization.  (Id.).  Plaintiff stated that her mother-in-law has increased her visits since plaintiff was hospitalized.  (Id.).

Plaintiff testified that she gets her medications filled at Wal-Mart and at Fort Leonard Wood. (Tr. 385). Plaintiff stated that she gets her pain medications, including the Motrin, at Fort Leonard Wood. (Id.). Plaintiff testified that she takes the Motrin on most days. (Id.). Plaintiff stated that she takes the Motrin in the morning and at night and occasionally takes a third dosage during the day if she feels she needs it. (Id.). Plaintiff testified that she does not experience any side effects from the Motrin. (Id.). Plaintiff stated that the Motrin relieves her pain. (Id.). Plaintiff testified that the Motrin also helps her sleep at night because it alleviates some of her pain. (Id.).

The ALJ then questioned the vocational expert, Dr. John McGowan, who testified that he had been present for plaintiff's testimony and he had reviewed the file. (Tr. 386). Dr. McGowan questioned plaintiff, who testified that she only managed one person when she owned the company. (Tr. 387). Dr. McGowan testified that plaintiff's work at the company she owned would be classified as general office administrative clerk, which is light and semi-skilled. (Tr. 388). Dr. McGowan stated that plaintiff's positions at Wal-Mart and Target would be classified as cashier-checker, which is light. (Id.). Dr. McGowan testified that plaintiff's position at Paramount Headwear would be classified as sewing machine operator, which is light. (Id.).

The ALJ asked Dr. McGowan to assume a hypothetical individual of plaintiff's age, education and work experience who could lift twenty pounds occasionally, ten pounds frequently, stand or walk about six hours in an eight-hour workday, and sit at least six hours in an eight-hour workday. (Tr. 389). Dr. McGowan testified that the individual would be able to perform plaintiff's past work. (Id.). Dr. McGowan stated that the limitations described in the hypothetical were consistent with the performance of light work. (Tr. 390). Dr. McGowan testified that

- 12 -

plaintiff's office clerk skills are not transferable.  (Id.).

The ALJ next noted that Dr. Honeywell found that plaintiff was not able to work a total of eight hours a day.  (Id.).  Dr. McGowan testified that plaintiff would not be able to work at any position if she were unable to work eight hours in a day.  (Tr. 391).

Plaintiff's attorney indicated that the record was complete.  (Id.).

## B.    Relevant Medical Records

The record reveals that plaintiff received treatment at Warren Air Force Base from October 2000 through February 2002, for various complaints that plaintiff indicates in her brief are unrelated to her alleged disability.  (Tr. 82-104).  On July 1, 2001, plaintiff underwent a CT scan of the abdomen, which revealed mild degenerative disc disease[8] in the thoracic[9] spine.  (Tr. 170).  On September 4, 2001, plaintiff underwent a CT scan of the abdomen, which revealed a mass in the right kidney and a large hiatal hernia.[10]  (Tr. 94).  Plaintiff underwent an MRI of the abdomen on September 5, 2001, which revealed a renal mass.  (Tr. 99).  On February 21, 2002, plaintiff was diagnosed with poorly controlled hypertension.[11]  (Tr. 104).

---

[8]A general term for both acute and chronic processes destroying the normal structure and function of the intervertebral discs.  See J. Stanley McQuade, Medical Information Systems for Lawyers, § 6:201 (1993).

[9]The back is comprised of the cervical, thoracic and lumbar regions.  In common terms, the cervical region of the spinal column is the neck; the thoracic region is the main part of the back; and the lumbar region is the lower back.  There are seven cervical vertebrae, twelve thoracic vertebrae, and five lumbar vertebrae.  The sacrum lies directly below the fifth lumbar vertebra.  The coccyx, or tail bone, lies below the sacrum.  See Medical Information Systems for Lawyers, § 6:27.

[10]Hernia of a part of the stomach through the esophageal hiatus of the diaphragm.  See Stedman's Medical Dictionary, 880 (28th Ed. 2006).

[11]High blood pressure.  Stedman's at 927.

Plaintiff presented to Edith Wilson, M.D. on September 13, 2001, for an evaluation regarding her kidney mass. (Tr. 106). Dr. Wilson's impression was right renal mass, most likely renal carcinoma.[12] (Tr. 107). Dr. Wilson recommended that a radical nephrectomy[13] be scheduled at the nearest convenient time. (Id.).

Plaintiff underwent a radical nephrectomy on September 25, 2001. (Tr. 110). On October 5, 2001, plaintiff reported that she was feeling fine and wanted to resume her normal activities. (Id.). Plaintiff was found to be in no acute distress. (Id.). Plaintiff's staples were removed and plaintiff was instructed not to do any type of strenuous exercise. (Id.). On November 2, 2001, Dr. Wilson noted that plaintiff was back to full activity. (Tr. 111). Dr. Wilson's assessment was Stage 1 renal cell carcinoma, no significant problems post-operatively. (Id.).

Plaintiff presented to Jon W. Roberts, D.O., at St. John's Physicians & Clinics, on April 10, 2002, to establish care after moving from Ft. Leonard Wood. (Tr. 131). Dr. Roberts diagnosed plaintiff with GERD,[14] hypertension, status post nephrectomy, and cardiac arrhythmia. (Id.). Dr. Roberts referred plaintiff to a urologist and a cardiologist. (Id.).

Plaintiff underwent an echocardiogram at St. Francis Hospital on April 12, 2002, due to an abnormal EKG, which revealed mildly reduced global left ventricular systolic function with

---

[12]Any of various types of malignant neoplasms; the most commonly occurring kind of cancer. See Stedman's at 307.

[13]Removal of a kidney. Stedman's at 1289.

[14]Gastroesophageal reflux disease (GERD) is a syndrome due to structural or functional incompetence of the lower esophageal sphincter, which permits retrograde flow of acidic gastric juice into the esophagus. Stedman's at 556.

severe hypokinesis[15] to akinesis[16] of the lateral wall, posterior wall, and inferior wall. (Tr. 146).

Plaintiff presented to St. John's Cardiovascular Specialists on May 2, 2002, with complaints of cardiac arrhythmia.[17] (Tr. 174). Plaintiff was diagnosed with PVCs (premature ventricular complexes),[18] hypertension, and obesity. (Tr. 174-75).

Plaintiff presented to Gen Leonard Wood Army Community Hospital on May 13, 2002, with complaints of pain at her incision site following a right nephrectomy for stage 1 renal cell cancer. (Tr. 164). Plaintiff reported that she was still slightly tender to palpation, although there was minimal pain with palpation. (Id.). Plaintiff underwent chest x-rays, which revealed a moderate hiatal hernia and no acute cardiopulmonary disease or mass lesion. (Tr. 168). Plaintiff also underwent a CT scan of the kidney, which revealed old disease seen within the kidney, mild atherosclerotic[19] change within the aorta, and degenerative disc disease within the spine. (Tr. 170). The physician found that the incision was well-healed without signs of hernias, swelling, or redness. (Tr. 164).

Plaintiff underwent a cardiac stress test at St. John's Regional Health Center on July 31, 2002, which was unremarkable. (Tr. 178).

Plaintiff presented to Southwest Missouri Family Healthcare on May 14, 2003, to establish care. (Tr. 197). It was noted that plaintiff had some mild arthritic symptoms. (Id.). Plaintiff

---

[15]Slow movement. Stedman's at 934.

[16]Loss of movement. Stedman's at 42.

[17]Irregularity of the heartbeat. See Stedman's at 136.

[18]A form of irregular heartbeat in which the ventricle contracts prematurely. See Stedman's at 421.

[19]Irregularly distributed lipid deposits in the arteries. See Stedman's at 174.

complained of occasional infrequent episodes of very mild dizziness and graying of her vision that occurs more with rapid changes in positions. (Id.). Plaintiff was diagnosed with hypertension, controlled; GERD, stable; and mild degenerative joint disease. (Tr. 198).

Plaintiff presented to Shahid K. Choudhary, M.D., on July 12, 2004, for a consultative examination at the request of the state agency. (Tr. 213-15). Plaintiff reported problems with her hand and back. (Tr. 213). Upon examination, plaintiff had no muscular atrophy, normal tone, full strength in both upper and lower extremities, full grip strength bilaterally, intact fine motor movements, and she was able to pick up several small objects slowly. (Tr. 215). Dr. Choudhary's impression was: arthritis, history of cancer, and history of heart disease. (Id.). With regard to plaintiff's arthritis, Dr. Choudhary stated that plaintiff had no obvious deformity of her joints. (Id.). He noted that plaintiff appeared to have some arthritis in her low back, yet no x-ray reports or other records were available to review. (Id.). With regard to plaintiff's history of cancer, Dr. Choudhary stated that plaintiff seemed to be stable at the time. (Id.). Dr. Choudhary stated that there were no records available to determine the exact etiology of plaintiff's history of heart problems. (Id.). Dr. Choudhary stated that plaintiff did not have any significant problems sitting, standing, walking, handling objects, hearing, or with speaking. (Id.). He noted that due to plaintiff's arthritis, she would probably have some difficulty lifting and carrying heavy weights. (Id.). Dr. Choudhary stated that no significant joint tenderness was noted upon examination. (Id.).

Plaintiff presented to Texas County Memorial Hospital on June 7, 2004, with complaints of elevated blood pressure and reported that she had passed out at home. (Tr. 245). Plaintiff was diagnosed with hypertension. (Id.). On January 24, 2005, and February 10, 2005, plaintiff

complained of depression. (Tr. 248-49). Plaintiff was diagnosed with depression and was prescribed Zoloft. (Id.). Plaintiff presented on March 11, 2005 and May 27, 2005 for routine visits to check her vital signs and refill her medications. (Tr. 250-51).

Kenneth Burstin, Ph.D., a state agency non-examining psychologist, completed a Psychiatric Review Technique on July 21, 2004. (Tr. 227). Dr. Burstin expressed the opinion that plaintiff had no medically determinable impairment. (Id.).

Plaintiff presented to the emergency room at Texas County Memorial Hospital on October 24, 2005, with complaints of profound shortness of breath. (Tr. 263). Plaintiff was found to be profoundly anemic. (Id.). Plaintiff was transfused with four units of blood during her hospital stay and was found to be doing well and in good spirits upon her discharge on October 28, 2005. (Id.). Plaintiff's diagnosis upon discharge was profound iron deficiency anemia,[20] history of hypertension, history of ovarian cancer, history of kidney cancer, history of depression, history of anxiety, and history of GERD. (Id.). Plaintiff was placed on a low fat diet and was instructed to engage in activities as tolerated. (Id.). Blood pressure medications were prescribed. (Id.). Plaintiff was also given an inhaler. (Id.).

Eugene Honeywell, M.D. completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) on November 17, 2005. (Tr. 310-12). Dr. Honeywell found that plaintiff was capable of frequently lifting or carrying twenty pounds; standing or walking less than two hours in an eight-hour workday; sitting less than six hours in an eight-hour workday;

---

[20]A condition in which the number of red blood cells, the amount of hemoglobin, and/or the volume of packed red blood cells are less than normal. Iron-deficiency anemia occurs when the dietary intake or absorption of iron is insufficient. Anemia is manifested by pallor of the skin, shortness of breath, lethargy, palpitations of the heart, and tendency to fatigue. See Stedman's at 79.

frequently balancing; and never climbing, kneeling, crouching, or crawling.  (Tr. 310-11).  Dr. Honeywell also found that plaintiff should avoid exposure to temperature extremes, hazards, fumes, odors, chemicals, and gases.  (Tr. 312).

Plaintiff saw John Demorlis, M.D. for a physical examination at the request of the state agency on April 20, 2006.  (Tr. 313-25).  Plaintiff's mental status was described as "talkative, pleasant lady who is intelligent."  (Tr. 316).  Upon physical examination, no sensory loss was noted; plaintiff had full grip strength; plaintiff was able to do a half squat and walk on her heels; and her gait was normal.  (Id.).  Dr. Demorlis' impression was: chest pain, atypical, in the process of being worked up; arthralgia[21] vs. traumatic arthritis; post fractured pelvis, left femur, left ankle all necessitating open reductions with instrumentation; chronic back pain; hypertension; obesity; history of severe iron deficiency anemia-etiology at this time is obscure; history of uterine cancer with removal of uterus in 1994; history of right nephrectomy for low grade renal carcinoma; large hiatal hernia resulting in GERD; minor venous insufficiency ankles; status post appendectomy; and 80 pack a year history of tobacco use-quit in 2001.  (Id.).

Dr. Demorlis completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical).  (Tr. 322-25).  Dr. Demorlis found that plaintiff could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, stand or walk at least two hours in an eight-hour workday, sit about six hours in an eight-hour workday and must periodically alternate sitting and standing to relieve pain or discomfort.  (Tr. 322-23).  Dr. Demorlis indicated that plaintiff's ability to push and pull in both extremities was limited.  (Tr. 323).  Dr. Demorlis indicated that these limitations were based on plaintiff's subjective complaints rather than his

---

[21]Pain in a joint.  Stedman's at 159.

objective findings. (Id.). Dr. Demorlis found that plaintiff could frequently balance and could occasionally climb, kneel, crouch, crawl, and stoop. (Id.). Dr. Demorlis indicated that plaintiff had no manipulative or visual/communicative limitations. (Tr. 324). Finally, Dr. Demorlis found that plaintiff should avoid exposure to hazards. (Tr. 325).

## The ALJ's Determination

The ALJ made the following findings:

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through June 30, 2005.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant's history of fractured pelvis, left femur, left ankle all necessitating open reductions with instrumentation, obesity, history of iron deficiency anemia, history of uterine cancer with removal of uterus in 1994 with no known residuals, history of right nephrectomy for low grade renal carcinoma, GERD, minor venous insufficiency in ankles, are in combination considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(c).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5. The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6. The claimant retains the residual functional capacity to perform the exertional and nonexertional requirements of light work.

7. The claimant's past relevant work as a cashier, office manager, sewing machine operator did not require the performance of work-related activities precluded by her residual functional capacity (20 CFR § 404.1565).

8. The claimant's medically determinable impairments do not prevent the claimant from performing her past relevant work.

9. The claimant was not under a "disability" as defined in the Social Security Act, at

any time through the date of the decision (20 CFR § 404.1520(f)).

(Tr. 21).

The ALJ's final decision reads as follows:

> It is the decision of the Administrative Law Judge that, based on the application filed on May 5, 2004, the claimant is not entitled to a period of disability or Disability Insurance Benefits under Sections 216(i) and 223, respectively, of the Social Security Act.

(Tr. 22).

**Discussion**

**A.      Standard of Review**

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry." Id.

**B.**     **The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.  See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or

equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.  See id.  If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience.  See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if s/he is not able to perform any other work.  See id.  Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

**C.     Plaintiff's Claims**

Plaintiff raises three claims on appeal from the decision of the Commissioner.  Plaintiff first argues that the ALJ erred in determining plaintiff's residual functional capacity.  Plaintiff next contends that the ALJ erred in finding that plaintiff could perform her past relevant work.  Plaintiff finally argues that the ALJ erred in assessing the credibility of her subjective complaints of pain and limitation.  The undersigned will address plaintiff's claims in turn, beginning with the ALJ's credibility analysis.

1.      **Credibility Analysis**

Plaintiff argues that the ALJ erred in assessing the credibility of her subjective complaints of pain and limitation.  Defendant contends that the ALJ's credibility determination is supported by substantial evidence on the record as a whole.

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced."  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (quoting settlement agreement between Department of Justice and class action plaintiffs who alleged that the Secretary of Health and Human Services unlawfully required objective medical evidence to fully corroborate subjective complaints).  Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the Polaski factors."  Kelley, 133 F.3d at 588.  Polaski requires the consideration of:  (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions.  Polaski, 739 F.2d at 1322.

The court finds that the ALJ's credibility determination regarding plaintiff's subjective complaints of pain and limitations is supported by substantial evidence in the record as a whole.  "[T]he question is not whether [plaintiff] suffers any pain; it is whether [plaintiff] is fully credible when she claims that [the pain] hurts so much that it prevents her from engaging in her prior work."  Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987).  Thus, the relevant inquiry is

whether or not plaintiff's complaints of pain to a degree of severity to prevent her from working are credible.

In his opinion, the ALJ specifically cited the relevant <u>Polaski</u> factors. (Tr. 14). The ALJ then properly pointed out <u>Polaski</u> factors and other inconsistencies in the record as a whole that detract from plaintiff's complaints of disabling pain. The ALJ first stated that the medical evidence does not support plaintiff's subjective complaints. Although the ALJ may not discount subjective complaints solely because they are not fully supported by the objective medical evidence, the lack of supporting objective medical evidence may be considered as a factor in evaluating the claimant's credibility. <u>See</u> <u>Curran-Kicksey v. Barnhart</u>, 315 F.3d 964, 968 (8th Cir. 2003).

The ALJ first discussed plaintiff's history of cancer. The ALJ noted that plaintiff quit working around August 2001 for treatment of renal cell cancer. (Tr. 15). Plaintiff underwent a right radical nephrectomy performed by Dr. Edith Wilson on September 25, 2001. (Tr. 15-16, 110). The ALJ noted that by November 2, 2001, plaintiff was back to full activity, with no significant problems post-operatively. (Tr. 16, 111). The only complaint related to plaintiff's cancer noted in the record was a May 2002 report of pain at the incision site. (Tr. 164). At this time, it was found that plaintiff's incision was well-healed without signs of hernias, swelling, or redness. (Tr. 164). The ALJ also pointed out that, although it appears plaintiff underwent a partial hysterectomy for uterine cancer in 1994, plaintiff did not undergo chemotherapy or radiation and no complications were noted. (Tr. 16). In July 2004, Dr. Choudhary found that plaintiff's history of cancer appeared to be stable. (Tr. 16, 215). The ALJ concluded that although plaintiff alleged these instances of cancer in connection with her application for

disability, they do not appear to be ongoing impairments. (Tr. 16). This finding is supported by the medical record.

The ALJ next discussed plaintiff's GERD, hypertension, and heart arrhythmia. (Id.). The ALJ stated that there is no indication in the record that these conditions significantly limit plaintiff's ability to perform work-related activities. (Id.). The ALJ noted that when plaintiff presented to Southwest Missouri Family Healthcare in May 2003 to establish care, plaintiff's hypertension and GERD were found to be stable. (Tr. 16, 198). The ALJ acknowledged that plaintiff had one instance in November 2004, in which she passed out at home when her blood pressure was low. (Tr. 16, 245). With regard to plaintiff's heart condition, the ALJ noted that plaintiff has been taking medication for heart arrhythmia since 1981, with no worsening of symptoms. (Tr. 16).

The ALJ next pointed out that although plaintiff alleges disability beginning August 2001 due to anemia and exhaustion, there is no indication that plaintiff was found to have profound iron deficiency anemia until late October 2005, after her date last insured. (Tr. 16, 263). At that time, plaintiff presented to the emergency room at Texas County Memorial Hospital with complaints of profound shortness of breath. (Tr. 263).

The ALJ then discussed plaintiff's musculoskeletal complaints. (Tr. 16-19). The ALJ stated that the record reveals that plaintiff's musculoskeletal complaints were relatively sporadic with little in the way of objectively displayed limitations. (Tr. 16). On July 1, 2001, plaintiff underwent a CT scan of the abdomen, which revealed mild degenerative disc disease in the thoracic spine. (Tr. 170). On May 14, 2003, plaintiff complained of mild arthritic symptoms and was diagnosed with mild degenerative joint disease. (Tr. 198). In July 2004, Dr. Choudhary

found that plaintiff had no muscular atrophy, normal tone, full strength in both upper and lower extremities, full grip strength bilaterally, intact fine motor movements, and no joint tenderness. (Tr. 215). The ALJ noted that when plaintiff was receiving physical therapy for anemia in October 2005, treatment notes indicated that she had normal strength and ambulated independently and safely without loss of balance and with the ability to pull an oxygen tank. (Tr. 18, 284). Finally, the ALJ pointed out that in April 2006, Dr. Demorlis found that plaintiff had no sensory loss, full grip strength, a normal gait, and was able to do a half squat and walk on her heels. (Tr. 316). The ALJ properly found that the objective medical record is not supportive of plaintiff's allegations of a disabling musculoskeletal impairment.

The ALJ next noted that plaintiff has only sought sporadic treatment for her various complaints. This is an appropriate consideration, because the fact that a plaintiff fails to seek regular medical treatment disfavors a finding of disability. See Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997). The ALJ properly concluded that, based on the objective medical record as a whole, plaintiff's allegation of disability is not credible.

The ALJ pointed out that, although plaintiff reported that her musculoskeletal pain began after she was involved in a motor vehicle accident in 1963, plaintiff was able to work for many years after the accident. (Tr. 16). The fact that a claimant worked successfully for a significant period of time with his or her impairments is inconsistent with a claim of disabling pain. See Orrick v. Sullivan, 966 F.2d 368, 370 (8th Cir. 1992).

The ALJ also discussed plaintiff's daily activities. (Tr. 20). The ALJ noted that plaintiff testified that she performs many household chores at her own pace, helps out in the kitchen at Bingo events, plays Bingo, and shops for groceries. (Tr. 20, 366-68). Significant daily activities

may be inconsistent with claims of disabling pain.  See Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001).  As such, the ALJ properly determined that plaintiff's ability to engage in all of these activities on a regular basis appears inconsistent with the inability to work.

Finally, the ALJ stated that plaintiff's appearance during the hearing did not strengthen her credibility.  (Tr. 20).  Specifically, the ALJ noted that he did not observe credible signs of serious discomfort during the hearing.  (Tr. 20).  "The ALJ's personal observations of the claimant's demeanor during the hearing [are] completely proper in making credibility determinations." Johnson v. Apfel, 240 F.3d 1145, 1147-48 (8th Cir. 2001).

An administrative opinion must establish that the ALJ considered the appropriate factors. See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001).  However, each and every Polaski factor need not be discussed in depth, so long as the ALJ points to the relevant factors and gives good reasons for discrediting a claimant's complaints.  See Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001).  In this case, the reasons given above by the ALJ for discrediting plaintiff's complaints of disabling pain are sufficient and his finding that plaintiff's complaints are not entirely credible is supported by substantial evidence.

## 2.    Residual Functional Capacity

Plaintiff argues that the residual functional capacity formulated by the ALJ is erroneous. Specifically, plaintiff contends that the ALJ erred in evaluating the medical opinion evidence. Defendant argues that the ALJ's residual functional capacity is supported by substantial evidence in the record.

After properly assessing plaintiff's credibility, the ALJ found that plaintiff was capable of performing the exertional and nonexertional requirements of light work.  (Tr. 20).

In analyzing medical evidence, "[i]t is the ALJ's function to resolve conflicts among 'the various treating and examining physicians.'" Johnson, 240 F.3d at 1148 (quoting Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)). "Ordinarily, a treating physician's opinion should be given substantial weight." Rhodes v. Apfel, 40 F. Supp.2d 1108, 1119 (E.D. Mo. 1999) (quoting Metz v. Halala, 49 F.3d 374, 377 (8th Cir. 1995)). This is to be contrasted with the axiom that "the opinion of a consulting physician who examines claimant once or not at all does not generally constitute substantial evidence." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (quoting Kelley, 133 F.3d at 589). Opinions of treating physicians may be discounted or disregarded where other medical "assessments are supported by better or more thorough medical evidence." Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997). An ALJ is free to reject the conclusions of any medical source if those findings are inconsistent with the record as a whole. See Johnson, 240 F.3d at 1148.

Plaintiff argues that the ALJ erred in discrediting the opinion of her treating physician, Dr. Honeywell, and in relying on the opinion of consulting physician Dr. Choudhary. Dr. Honeywell completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) on November 17, 2005. (Tr. 310-12). Dr. Honeywell found that plaintiff was capable of frequently lifting or carrying twenty pounds; standing or walking less than two hours in an eight-hour workday; sitting less than six hours in an eight-hour workday; frequently balancing; and never climbing, kneeling, crouching, or crawling. (Tr. 310-11). Dr. Honeywell also found that plaintiff should avoid exposure to temperature extremes, hazards, fumes, odors, chemicals, and gases. (Tr. 312).

The ALJ discussed Dr. Honeywell's findings. (Tr. 19). The ALJ, however, stated that the basis for these significant limitations is not clear, as it does not appear that Dr. Honeywell treated

plaintiff for complaints that would contribute to these limitations. (Id.). Dr. Honeywell's records reveal that he treated plaintiff from June 2004 through October 2005, primarily for hypertension. (Tr. 241-307). Dr. Honeywell did not cite to any objective findings or even diagnoses as support for his findings. As such, the undersigned finds that the ALJ provided sufficient reasons for assigning little weight to Dr. Honeywell's assessment.

Plaintiff saw Dr. Choudhary on July 12, 2004, for a consultative examination at the request of the state agency. (Tr. 213-15). Upon examination, plaintiff had no muscular atrophy, normal tone, full strength in both upper and lower extremities, full grip strength bilaterally, intact fine motor movements, and she was able to pick up several small objects slowly. (Tr. 215). Dr. Choudhary's impression was: arthritis, history of cancer, and history of heart disease. (Id.). With regard to plaintiff's arthritis, Dr. Choudhary stated that plaintiff had no obvious deformity of her joints. (Id.). He noted that plaintiff appeared to have some arthritis in her low back, yet no x-ray reports or other records were available to review. (Id.). With regard to plaintiff's history of cancer, Dr. Choudhary stated that plaintiff seemed to be stable at the time. (Id.). Dr. Choudhary stated that plaintiff did not have any significant problems sitting, standing, walking, handling objects, hearing, or speaking. (Id.). He noted that due to plaintiff's arthritis, she would probably have some difficulty lifting and carrying heavy weights. (Id.). Dr. Choudhary stated that no significant joint tenderness was noted upon examination. (Id.).

Plaintiff saw John Demorlis, M.D. for a physical examination at the request of the state agency on April 20, 2006. (Tr. 313-25). Upon physical examination, no sensory loss was noted; plaintiff had full grip strength; was able to do a half squat and walk on her heels; and her gait was normal. (Id.). Dr. Demorlis' impression was: chest pain, atypical, in the process of being worked up; arthralgia vs. traumatic arthritis; post fractured pelvis, left femur, left ankle all necessitating

open reductions with instrumentation; chronic back pain; hypertension; obesity; history of severe iron deficiency anemia-etiology at this time is obscure; history of uterine cancer with removal of uterus in 1994; history of right nephrectomy for low grade renal carcinoma; large hiatal hernia resulting in GERD; minor venous insufficiency ankles; status post appendectomy; and 80 pack a year history of tobacco use-quit in 2001. (Id.). Dr. Demorlis completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical). (Tr. 322-25). Dr. Demorlis found that plaintiff could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, stand or walk at least two hours in an eight-hour workday, sit about six hours in an eight-hour workday and must periodically alternate sitting and standing to relieve pain or discomfort. (Tr. 322-23). Dr. Demorlis indicated that plaintiff's ability to push and pull in both extremities was limited. (Tr. 323). Dr. Demorlis indicated that these limitations were based on plaintiff's subjective complaints rather than objective findings. (Id.). Dr. Demorlis found that plaintiff could frequently balance and could occasionally climb, kneel, crouch, crawl, and stoop. (Id.). Dr. Demorlis indicated that plaintiff had no manipulative or visual/communicative limitations. (Tr. 324). Finally, Dr. Demorlis found that plaintiff should avoid exposure to hazards. (Tr. 325).

The ALJ discussed the findings of Drs. Choudhary and Demorlis. (Tr. 18-19). The ALJ concluded that the assessment of Dr. Choudhary was consistent with the diagnosed impairments and the limitations he found on examination, as well as those observed in the examination by Dr. Demorlis and the treatment notes of Dr. Honeywell. (Tr. 19). The ALJ noted that Dr. Choudhary essentially limited plaintiff to performing light work.

The undersigned finds that the ALJ provided sufficient reasons for assigning greater weight to the opinion of Dr. Choudhary regarding plaintiff's limitations. Notably, Dr. Demorlis indicated that the limitations he found were based on plaintiff's subjective allegations rather than

the objective findings, whereas Dr. Choudhary's assessment was supported by his objective findings upon examination.

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).

In this case, the ALJ's residual functional capacity determination is supported by substantial evidence. As previously discussed, the ALJ properly weighed the medical opinion evidence and found that Dr. Choudhary's opinion was supported by the medical evidence as a whole. Dr. Choudhary found that plaintiff was not limited in her ability to sit, stand, or walk. (Id.). He noted that due to plaintiff's arthritis, she would probably have some difficulty lifting and carrying heavy weights. (Id.). These limitations are consistent with the ability to perform light work. Even Dr. Honeywell found that plaintiff was capable of frequently lifting or carrying twenty pounds, which is consistent with the lifting requirements of light work. The record does not support the presence of any greater restrictions than those found by the ALJ. Although plaintiff contends that the ALJ erred in relying on the opinion of a state agency non-physician, the ALJ did not refer to this assessment anywhere in his opinion. Thus, the ALJ's determination that plaintiff was capable of performing light work is supported by substantial evidence.

**3.      Ability to Perform Past Relevant Work**

Plaintiff argues that the ALJ erred in concluding that plaintiff was capable of performing her past relevant work.  Plaintiff contends that the ALJ should have applied the Medical Vocational Guidelines.

Throughout the disability determination process, the burden remains on the claimant until she adequately demonstrates an inability to perform her previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work as it exists in the national economy.  See Beckley, 152 F.3d at 1059; 20 C.F.R. §§ 404.1520(f), 416.920(f).  Plaintiff argues that the ALJ erroneously determined that she could perform her past relevant work as cashier, office manager, and sewing machine operator.

As defendant points out, the ALJ properly concluded at step four that plaintiff's residual functional capacity did not preclude the performance of plaintiff's past work as cashier, office manager, and sewing machine operator.  Further, although vocational expert testimony was not required, the ALJ did elicit the testimony of a vocational expert at the hearing to aid in this determination.  Thus, plaintiff's argument lacks merit.

## **Conclusion**

Substantial evidence in the record as a whole supports the decision of the ALJ finding plaintiff not disabled because the evidence of record does not support the presence of a disabling impairment. Accordingly, Judgment will be entered separately in favor of defendant in accordance with this memorandum.

Dated this ___23rd___ day of September, 2008.

_Lewis M. Blanton_
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE